448 

STATE BOARD OF TAX APPEALS.

APPEAL BY SHELTON PITNEY AND WALTER P. GARDNER, TRUSTEES OF THE PROPERTY OF THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, FROM THE PROPERTY ASSESSMENT AND FRANCHISE EXCISE TAX ASSESSMENT MADE BY THE STATE TAX COMMISSIONER OF THE STATE OF NEW JERSEY AGAINST THE PROPERTY AND FRANCHISE OF THE CENTRAL RAILROAD COMPANY OF NEW JERSEY SYSTEM FOR THE YEAR 1942.

IN THE MATTER OF THE ASSESSMENT AND TAXATION OF THE PROPERTY OF, AND THE ASSESSMENT OF FRANCHISE TAXES AGAINST, THE SEVERAL COMPANIES CONSTITUTING THE CENTRAL RAILROAD OF NEW JERSEY USED FOR RAILROAD PURPOSES IN THE STATE OF NEW JERSEY FOR THE YEAR 1942.

Decided November 4, 1942.

For the Central Railroad Company of New Jersey, *Joseph Autenrieth* and *William Hanlon*.

For the State Tax Commissioner, *David T. Wilentz,* Attorney-General (by *Harry Walsh*).

For the City of Jersey City, *Frank P. McCarthy.*

WAESCHE, President. This opinion and final determination will deal with the complaint filed by the trustees of the property of the Central Railroad Company of New Jersey, and also with the complaint filed by the City of Jersey City. Both of these appeals seek relief from the assessments made by the State Tax Commissioner against the Central Railroad Company of New Jersey pursuant to chapter 291 of the laws of 1941 and the amendments thereto.

There are three generally recognized methods of valuation which might be used in arriving at the fair value of the parcels, assessment of which is here contested. These are: (1) value in the railroad use, as part of a transportation system; (2) value as indicated by sales of comparable lands; (3) value as indicated by the appraisal of disinterested experts in realty appraisal. Evidence and testimony have been presented relative to each of these factors and due consideration has been given to each.

With respect to value in use, the properties which are involved in this appeal constitute an integral part of the property of the Central Railroad Company of New Jersey. Their general location, use and area may be summarized as follows:

The Hudson River water front of the Jersey City Terminal of the Central Railroad Company of New Jersey begins at Johnson Avenue. From this point the west shore of the river continues in a relatively unbroken line in a southerly direction for approximately 1,100 feet. Then the shore line turns sharply westerly, nearly at a right angle, and runs for about 2,400 feet in an almost straight line, where it again turns abruptly and runs southwesterly and passes behind Ellis Island. The land under water along this water front which is owned by the Central Railroad and assessed by the State Tax Commissioner consists of approximately 172.5 acres.

The first 1,100 feet of the water front south of Johnson Avenue and piers 5, 6 and 7 have unrestricted access to the main channel of the Hudson River. Piers 9, 10, 11, 12, 13, 14, 15 and 18 are reached through a channel running back of Ellis Island which reaches the main channel of the Hudson River both to the north and to the south of Ellis Island. This channel is dredged to a minimum depth of approximately 18 feet and to a maximum width of about 400 feet. Silt tends to fill the channel and at depths below 20 feet the channel silts rapidly. Piers 11, 12, 13, 14 and 15 are all immediately in the rear of Ellis Island. Pier 18 is located a little southwest of Ellis Island.

The first 1,100 feet of water front property south of Johnson Avenue is used almost exclusively by the ferries and freight car floats. Piers 6, 7, 10, 11, 12, 13 and 14 are used exclusively for handling lighterage freight. Pier 15 is a small pier used exclusively for loading live stock onto barges. Piers 9 and 18 are exclusively coal piers. There are no other piers along the water front of the Central Railroad terminal in Jersey City. That part of the water front not used in connection with the piers is used for storing barges that are waiting to be loaded, for repairs to the marine equipment owned by the Central Railroad, and for other miscellaneous matters.

In its present condition no part of the water front of the Central Railroad terminal in Jersey City could be used or is intended for use by ocean going vessels. More than two-thirds of this water front is certainly undesirable for such use, because the channel approaches to this portion of the water front from the main channel of the Hudson River would be very difficult for ocean going vessels to pass through, and the cost to keep open such approaches would be costly to maintain.

The upland extending back from the water front which is used for second class railroad purposes and included in the area of the Jersey City terminal of the Central Railroad consists of approximately 468.289 acres. This upland is used for various purposes. The sites for the terminal passenger station, the Van Nostrand Place station, and station sheds

are located on this land; and strips of this land are used for Johnson Avenue, Phillips Street and other streets. The roundhouse, engine terminal and engineman's house; large coal storage dumps, live stock runways, and vacant space for the storage of freight; the marine repair yards, live stock yards, and other various yards with their miles of trackage are all located on this upland. There are yards for receiving and sorting or classification of freight cars, and yards for the storage of empty and loaded freight and passenger cars; and there are also yards for repairing passenger and freight cars and for the repair of engines. There are also tracks leading to the piers on the water front.

It is obvious that most of the upland in no way contributes to a use that requires water front facilities, but on the contrary it is used for purposes that are quite independent of the water front. For instance, the land used for the storage of coal and freight; the land used for streets; the land used for stations and station sheds; the land where the roundhouse, engine terminal, and engineman's house are located; the land used for the repair yard tracks, the receiving yard, and sorting or classification yard tracks, and the storage yard tracks does not require water front facilities. The water front of the Central Railroad terminal in Jersey City is used only to transfer passengers and freight from the trains to boats—or *vice versa*—for passage across the Hudson River to and from New York usually at the expense of the Central Railroad. The Hudson River is a barrier to convenient and easy access between New York and the Central Railroad terminal in Jersey City. The water front of this terminal adds nothing to the revenues of the Central Railroad. All the services rendered at the water front of the Central Railroad terminal at Jersey City represent only cost in the transportation of passengers and freight across the Hudson River.

It has been repeatedly held that the property to be assessed, whatever may be its character, is to be taken and valued in the actual condition in which the owner holds it. *State, Colwell, Pros.,* v. *Abbott,* 42 *N. J. L.* 111; *Central Railroad of New Jersey* v. *State Board of Assessors,* 48 *Id.* 148, 278;

4 *Atl. Rep.* 578; *Williams* v. *Bettle*, 51 *N. J. L.* 512; 18 *Atl. Rep.* 750; *Stevens Institute* v. *State Board*, &c., 105 *N. J. L.* 99; 143 *Atl. Rep.* 356; *affirmed*, 105 *N. J. L.* 655; 146 *Atl. Rep.* 919. On the assessing date, January 1st, 1941, the land involved in this tax proceeding was used by the Central Railroad Company of New Jersey in the public service. Its use is limited by the government to railroad purposes and the government fixes the rates to be charged for the services rendered by the railroad to which this land contributes. This limitation on the utilization of the land and the fixed rates charged for the services rendered through the use of the land necessarily affects its true value because "the value of a real property must be computed from its estimated future net income" ("Valuation of Real Estate," by Babcock, page 130). Land can have no value in and of itself. Its value depends upon the services it can perform to persons who may acquire it. The Central Railroad Company of New Jersey is in bankruptcy. For the year 1940 the Central Railroad of New Jersey operated at a loss of $755,977, exclusive of interest on bonds, return on investment, reinvestment, and surplus for operations. For more than ten years prior to 1941, the Central Railroad's operating costs have greatly exceeded its revenues. In the case of *Atlantic City* v. *State Board of Tax Appeals*, 128 *N. J. L.* 278; 25 *Atl. Rep.* (2d) 423, the Supreme Court held that the fact that the net earnings of the Lafayette Atlantic Hotel Company had decreased over a period of years from a substantial profit to a large loss was evidence of the value of the real estate used in the business of that company.

There are reasons other than the economic depression which began in 1930 for this loss in the railroad's revenues. A large part of the business done by this railroad is the transportation of coal from Wilkes-Barre and other points in Pennsylvania to the Central Railroad terminal in Jersey City. This coal business has fallen off approximately 30%, principally because of the substitution of oil, gas, coke and electricity for fuel and heating purposes. The transportation of freight by truck, and public travel by bus, automobile and airplane has also taken away much of the carrying business

done by the railroad in former years. The Central Railroad Company of New Jersey is not the only railroad that has suffered severe losses due to the diversion of freight and passengers to other means of transportation. Many of the railroads of this country, between 1930 and 1941, became insolvent and passed into the hands of trustees in bankruptcy because of this loss of business. A few years ago the future of the railroads of this country presented a national crisis. The bulletin of Statistics of Class 1 Railways in the United States for the calendar years ended December 31st, 1929, to December 31st, 1940, inclusive, which covers the operations of railways of Class 1 only; namely, carriers with annual revenues above $1,000,000, shows a decrease of total operating revenues in 1940 of 31.5% below 1929; and a decrease of net operating revenues in 1940 of 45.5% below 1929. Switching and terminal company statistics are not included in this bulletin. Class 1 railways operate approximately 94% of the total railway mileage of the United States, and earn about 96% of the total revenues. (Association of American Railroads, Bureau of Railway Economics, Washington, District of Columbia, October, 1941, Statistical Summary No. 25.)

In the case of *Somerville and Easton Railroad Co.* ads *Doughty,* 22 *N. J. L.* 495, 504, the court said that, "the present value of lands must often depend upon the future and prospective use to which they may" be appropriated. Mr. Frederick M. Babcock says in his book entitled, "Valuation of Real Estate," on page 22, that, "the expected future productivity of properties gives them their values." And on page 26 he says, "land is not capable of productive use without the fertilizing agency of applications of capital and labor, it does not possess value by virtue of its own characteristics, but only by virtue of its utility in assisting in production jointly with capital and labor."

The only value for railroad purposes that can be attributed to land used in the operation of a railroad is the residual quantity remaining only after a sufficient portion of the income from the railroad has been attributed to labor and capital, *i. e.,* operating expenses, interest on bonds, &c. In other words the value of land for railroad purposes is meas-

ured by the difference between the value of the services rendered by the railroad and the costs of the labor and capital necessary in its utilization for railroad purposes.

This is the familiar and approved capitalization of net income. The value of the property in railroad use may be approximated by capitalizing net income, and such a value, considered with other factors, may be accepted as indicative of fair market value.

But it is impossible to allocate to the land in the terminal area its proper share of the revenues earned by the railroad as a whole. The terminal's properties are an integral part of the entire system. It is, therefore, impossible to determine the true value of the land for railroad use in the terminal area separated from the rest of the railroad by the capitalization process.

In any case, since the Central Railroad of New Jersey is in bankruptcy, owing to a deficiency of earnings in relation to costs, including fixed charges, the capitalization of net income would be a rather futile proceeding were an allocation of earnings feasible.

A variation of the capitalization method is the stock and bond method of valuation. This method reflects the composite judgment of investors with respect to the present outlook and the future prospects for the corporation whose securities they buy and sell. Evidence pertaining to the stock and bond values of the Central Railroad of New Jersey was presented by Mr. Ralph E. Thompson, assistant tax agent for the company. Mr. Thompson produced a graph *(Exhibit CR-70)* showing the trend of the combined prices of the Central Railroad stock and bonds from 1929 to 1942. Mr. Thompson took the highest price at which the stock sold per share in each month and to that he added the highest per cent. of par value at which the 5% coupon bonds sold in each month. The sum of these two prices is plotted by months on the graph. The graph shows a decline of from over $450 in 1929 as the combined selling price of one share of stock and per $100 of a $1,000 bond to less than $25 in 1940 and 1941. In December, 1940, a $1,000 bond of the Central Railroad of New Jersey sold for only $140, and the stock

sold at $3 a share. In January, 1941, a $1,000 bond of the Central Railroad of New Jersey sold for only $160 and the stock sold for $2 a share. There are 275,000 shares of stock issued and outstanding of the par value of $100 per share; and the total par value of the bonds issued and outstanding is $48,000,000. The assessed value as of January 1st, 1941, of the real estate in Class I and Class II property of the Central Railroad Company is $68,655,720. If this is the true value of the real estate there is ample security for the payment of the bonds. However, the bonds were selling on January 1st, 1941, at the rate of only 15% of their par value. At this rate the total bond issue had a value of only $7,200,000 on January 1st, 1941.

The United States Supreme Court said in the case of *State Railroad Tax Cases*, 92 *U. S.* 575, 605:

"It is therefore obvious that when you have ascertained the current cash value of the whole funded debt, and the current cash value of the entire number of shares, you have, by the action of those who above all others can best estimate it, ascertained the true value of the road, all its property, its capital stock, and its franchises; for these are all represented by the value of its bonded debt and of the shares of its capital stock."

In *Columbus Southern Railway* v. *Wright*, 151 *U. S.* 470 (1894), the Supreme Court said:

"The roadway itself of a railroad depends for its value upon the traffic of the company, and not merely upon the narrow strip of land appropriated for the use of the road, and the bars and crossties thereon. The value of the roadway at any given time is not the original cost, nor, *a fortiori*, is ultimate cost after years of expenditure in repairs and improvements. On the other hand, its value cannot be determined by ascertaining the value of the land included in the roadway assessed at the market price of adjacent lands, and adding the value of the crossties, rails and spikes. The value of the land depends largely upon the use to which it can be put, and the character of the improvements upon it. The assessable value, for taxation, of a railroad track can only be determined by looking at the elements on which the finan-

cial condition of the company depends, its traffic, as evidenced by the rolling stock and gross earnings in connection with its capital stock." (Pages 480-1.)

In *C. C. C. and St. L. Railway* v. *Backus,* 154 *U. S.* 439 (445), which was recently cited with approval by the Supreme Court in the *Great Northern Railroad Case,* 297 *Id.* 135, the court said:

"The rule of property taxation is that the property is the basis of taxation. It does not mean a tax upon the earnings which the property makes, nor for the privilege of using the property, but rests solely upon the value. But the value of property results from the use to which it is put and varies with the profitableness of that use, present and prospective, actual and anticipated. There is no pecuniary value outside of that which results from such use. The amount and profitable character of such use determines the value, and if the property is taxed at its actual cash value, it is taxed upon something which is created by the uses to which it is put."

In *Adams Express Co.* v. *Ohio State Auditor,* 166 *U. S.* 185, the court said:

"Now it is a cardinal rule which should never be forgotten that whatever property is worth for the purposes of income and sale, it is also worth for purposes of taxation * *' * the value which property bears in the market, the amount for which the stock could be bought and sold is the real value. Business men do not pay cash for property in moonshine or dreamland. They buy and pay for that which is of value in its power to produce income or for purposes of sale." (Pages 220, 221.)

See, also, *Atlantic City* v. *State Board of Tax Appeals,* 128 *N. J. L.* 278; 25 *Atl. Rep.* (2d) 423.

We have been urged to accept, as an indication of the true value of the lands involved in this tax proceeding the price which the company would now have to pay to acquire these lands if it did not own them, or the cost of replacing them in their present condition. But replacement cost is not, of itself, a correct or reliable indication of true value. The true value of land springs from and is an indication of the advantage that is expected to result from the ownership

thereof. The cost of land is a measure of the sacrifice, often a necessity, involved in acquiring it. Frequently land is not worth what it cost. In all probability the land now owned and used by the Central Railroad for railroad purposes is not worth what it would cost to replace it. Professor James C. Bonbright says in his book "The Valuation of Property," "that the value of property is nothing but the value of an opportunity to derive future profits or other services, and that cost is literally irrelevant save for its indirect bearing on this opportunity" (page 20). And Mr. Frederick M. Babcock says in his book "The Valuation of Real Estate," that, "there is rarely, in fact, any connection between the cost of replacement of a building and its value." (Page 36.)

It has been suggested that if the Central Railroad did not own this land it would have to buy it at a very high price because of the scarcity of land available for railroad use near the water front. Market value is not that price which is created by the necessities of the buyer. A purchaser who must purchase at a high sacrifice price does not reflect the true value of the property any more than does a seller who must sell at a low sacrifice price. Market price is the resultant of bids and offers from many individuals who place their own valuations on the properties. Profesor Bonbright says in his book, "Valuation of Property" (volume 1, page 59):

"The market value means the fair value of the property as between one who wants to purchase and one who wants to sell, not what could be obtained for it under peculiar circumstances when a greater than its fair price could be obtained nor its speculative value; not a value obtained from the necessities of another; nor, on the other hand, is it to be limited to that price which the property would bring when forced off at auction under the hammer. It is what it would bring at a fair public sale when one party wanted to sell and the other to buy."

In the case of *Currie* v. *Waverly, &c., Railroad Co.*, 52 *N. J. L.* 381; 20 *Atl. Rep.* 56, the Court of Errors and Appeals said that in computing the market value of land in a condemnation proceeding, "neither the individual advan-

tages to the party acquiring the land, nor the necessity of its acquisition can be considered." Lewis Orgel states in his book "Valuation Under the Law of Eminent Domain" that, "in general, the courts have ruled hold-up prices out of consideration, just as they have ruled out forced-sale prices." (Section 22, page 73.)

Were we, however, to rely upon the contention that replacement cost should be considered, no evidence has been submitted in this hearing with respect to the prices that have been paid for lands in the terminal area which would support the view that the true value, in so far as sales may be indicative of such value, would be as great as the assessments from which appeal is taken.

The appraisal method involves resort to the opinion and judgment of persons qualified as experts to express such judgments respecting the value of property. No appraisal is to be accepted as more than an individual judgment, and the degree of reliance to be placed upon it must depend upon the extent to which that judgment can be corroborated by other factors.

The Board has examined carefully the testimony of Mr. George J. Daly, a witness called by the City of Jersey City. Mr. Daly testified as a real estate expert. He gave the same value to the land under water as he gave to the upland in the same tract. Counsel for Jersey City asked Mr. Daly this question:

"Q. And in placing your value upon these properties which you have designated as water front properties, have you considered the land under water and the uplands in the same tract, in the same acreage and at the same value?"

Mr. Daly's answer was:

"A. Yes, sir; I have."

On *Exhibit JC*-4, Mr. Daly valued as water front property 97.063 acres at the rate of $80,000 per acre. Approximately 51 acres of this tract are under water.

The second tract in *Exhibit JC*-4 he valued as water front property contains 71.3 acres. He placed a value on this property at the rate of $65,000 per acre. Twenty-one acres of this tract are under water.

The third tract in *Exhibit JC*-4 he valued as water front property contains 84.724 acres. He placed a value of $55,000 per acre on this tract. Twelve acres of this tract are under water.

The fourth tract in *Exhibit JC*-4 contains 96.049 acres. Mr. Daly values this tract as water front property at the rate of $55,000 per acre. Twenty-eight acres of this tract are under water.

The fifth tract in *Exhibit JC*-4 contains 67.004 acres. Mr. Daly values this tract as water front property at the rate of $55,000 per acre. Eighteen acres of this tract are under water.

The eighth tract in *Exhibit JC*-4 contains 71.503 acres. Mr. Daly values this tract as water front property at the rate of $55,000 per acre. Twenty-eight acres in this tract are under water.

The ninth tract in *Exhibit JC*-4 contains 20.95 acres. Mr. Daly values this tract as water front property at the rate of $70,000 per acre. Fourteen acres in this tract are under water.

The sixth tract in *Exhibit JC*-4 contains 28.718 acres. No part of this tract is under water. It is used entirely for railroad yards. Mr. Daly nevertheless values it as water front property at the rate of $80,000 per acre.

The seventh tract in *Exhibit JC*-4 contains 24.613 acres. No part of this tract is under water; instead its nearest point to the water front is approximately 600 feet away. It is used entirely for railroad yards. Mr. Daly nevertheless values it as water front property at the rate of $80,000 per acre.

In Mr. Daly's appraisal of water front property he makes no difference between the value of the land under water and the value of the upland for a distance of a mile back from the water front. In making his appraisal Mr. Daly gave no consideration to the uses made of the land, although it is obvious that both the character of the land under water and the use to which it is put differ from the character of the upland and the use to which it is put. According to Mr. Daly's appraisal, it all has the same value. Neither did Mr. Daly consider the income derived from the use of the

land nor the sales of water front property in the neighborhood. He said there were no comparable sales although he considered all the sales of water front property that were made during the past twenty years or more.

He mentioned a sale made in February, 1928, of 3.43 acres on the Kill Van Kull in Bayonne which sold at the rate of $23,300 per acre. He mentioned a sale that took place in July, 1929, of 25.275 acres of water front property in Edgewater which sold at the rate of $35,600 per acre. He mentioned another sale of 7.68 acres of water front property in Edgewater which sold in December, 1929, at the rate of $4,280 per acre. He mentioned a sale of .107 acres on the Kill Van Kull which sold in August, 1936, at the rate of $27,875 per acre. He mentioned a sale on New York Bay in Bayonne of 11.786 acres which sold in December, 1937, at the rate of $18,029 per acre. He mentioned a sale of 10.828 acres of water front property in Hoboken which sold in January, 1938, at the rate of $27,264 per acre. He mentioned another sale of water front property in Edgewater that sold in May, 1939, at the rate of $14,000 per acre; and another sale of water front property in Edgewater of 3.7 acres which sold in May, 1939, at the rate of $15,135 per acre. He mentioned a sale of 28.069 acres of water front property on the Kill Van Kull in Bayonne which sold in May, 1941, for $7,150 per acre.

Mr. Daly values the land under water along the Central Railroad terminal in Jersey City at from $55,000 per acre to $80,000 per acre, notwithstanding the fact that in November, 1941, Jersey City sold to the United States Government 329.5 acres of water front property located in Jersey City near the Central Railroad terminal, which was almost entirely under water, at the rate of $6,070 per acre. As land under water this property bought by the United States Government seems to possess approximately the same utility as the land under water owned by the Central Railroad Company. Mr. Daly testified that in his opinion this land, which was bought by the United States Government from Jersey City in November, 1941, was only 10% less valuable as water front property than the water front property of the Central Railroad terminal.

After considering all of Mr. Daly's testimony, we are convinced that he has not given proper consideration to the elements of value that should be considered in determining the true value of the property of the Central Railroad Company located in Jersey City. His values are purely speculative and can not be considered by the Board in arriving at the true value of the property under consideration in this appeal.

Mr. Coffin was called by Jersey City as a witness and testified as a real estate expert. His testimony is similar to Mr. Daly's testimony except that Mr. Coffin gives a higher value to the property. Both Mr. Coffin and Mr. Daly valued as water front property practically all the upland within a mile of the water front at the same rate per acre as they valued the land along the water's edge, and they both valued the land under the water (172.5 acres) at the same rate per acre that they valued the adjacent upland. Mr. Coffin gave no consideration to the use to which the land was actually put or the conditions and limitations of its use as railroad property. He disregarded the selling price of similar land in the vicinity. He disregarded the limited utility of the land. Apparently he considered only the sacrifice price that the railroad might be willing to pay for the land if it did not own it and needed it for water front facilities. He testified as follows:

"*Q.* Do you know of any sale of Hudson River water front property with a depth of that extent that sold at any time for anything in excess of $20,000 per acre? *A.* I know of no such sale within the last 25 years.

"*Q.* Or any New York Bay water front property of similar depth that sold for a price in excess of $20,000 per acre? *A.* No, there has been no such sale."

Mr. Mantell, who was called as a witness by Jersey City, in effect said that the more railroad property cost the greater was its value. He testified that cost and true value were the same. His appraisal of the land was his opinion of the cost to acquire it if the railroad didn't own it and had to buy it.

But, as already noted, no evidence was submitted to establish that even if the railroad had to buy water front facilities,

the price it would pay in a voluntary transaction would be as high as the estimates of value made by Messrs. Daly and Coffin. Certainly such sales prices as were cited in the testimony would not support this view. Nor can we admit as valid indications of true value any speculations respecting the kind of "hold-up" price which might be exacted were the railroad to be in the position of a necessitous buyer.

Such speculations become the more fanciful in view of the fact that they are exactly opposite to the facts. The Central Railroad of New Jersey owns this land and is not obliged to buy it to-day at a "hold-up" price. In fact this company, like many others, is dispossessing itself of land which it no longer needs. Water front land in Jersey City and Bayonne and vicinity, having a total area of 1,456 acres has been abandoned by the Central Railroad of New Jersey as not worth the taxes, and additional acreage is on the market for sale.

The fact appears to be that the changing methods and conditions of travel have reversed the attitude of the railroads toward land and their policy with respect to land acquisition. In the horse and buggy days, when the railroads were practically the only means of travel and of freight shipment, the railroads were often inclined to acquire all the land possible. As a result, any land desired by a railroad company was quoted at a much higher value than other lands in the neighborhood. With the advent of the motor vehicle, the airplane, the pipe line, and the declining use of coal for heating purposes, there is no longer as intense a demand for land by railroad companies. In some cases they have seen the utility of overlarge holdings diminish, and even approach zero, as in the case of the acreage abandoned by the Central Railroad. The railroads are no longer disposed to pay top prices for land, and any appraisal based on an assumption that they are is fanciful and far from realistic.

The conventional idea that land needed or used for railroad purposes has a much higher value than exactly similar land in the immediate vicinity thereof is a delusion which has its origin in the early period of railroad development before government regulation and control came into effect.

Mr. Daly, Mr. Coffin and Mr. Mantell apparently are laboring under this false notion which to-day is only a popular myth and not an economic reality. Many popular myths have great appeal and because of that fact some are used as bait to win votes at election time, but they should not be permitted to creep into a judicial determination. In the public interest the economic problems of the railroads must be separated from politics and popular mythology.

In *The Minnesota Rate Cases,* 230 *U. S.* 350; 57 *L. Ed.* 1511, the United States Supreme Court speaking through Mr. Justice Hughes said that property of a railroad is devoted to a public use and that its value must be calculated on its use for the convenience of the public. In his opinion the court said:

"The owner would not be entitled to demand payment of the amount which the property might be deemed worth to the company; or of an enhanced value by virtue of the purpose for which it was taken; or of an increase over its fair market value, by reason of any added value supposed to result from its combination with tracts acquired from others, so as to make it a part of a continuous railroad right of way held in one ownership. * * *

"Moreover, it is manifest that an attempt to estimate what would be the actual cost of acquiring the right of way if the railroad were not there is to indulge in mere speculation. The railroad has long been established; to it have been linked the activities of agriculture, industry, and trade. Communities have long been dependent upon its service, and their growth and development have been conditioned upon the facilities it has provided. The uses of property in the communities which it serves are to a large degree determined by it. The values of property along its line largely depend upon its existence. It is an integral part of the communal life. The assumption of its non-existence, and at the same time that the values that rest upon it remain unchanged, is impossible and cannot be entertained. The conditions of ownership of the property and the amounts which would have to be paid in acquiring the right of way, supposing the railroad to be removed, are wholly beyond reach of any process of rational

determination. The cost-of-reproduction method is of service in ascertaining the present value of the plant, when it is reasonably applied and when the cost of reproducing the property may be ascertained with a proper degree of certainty. But it does not justify the acceptance of results which depend upon mere conjecture. * * *

"It is not admissible to attribute to the property owned by the carriers a speculative increment of value, over the amount invested in it and beyond the value of similar property owned by others, solely by reason of the fact that it is used in the public service. That would be to disregard the essential conditions of the public use, and to make the public use destructive of the public right. * * *"

The court also held that the market value of railroad property "cannot properly extend beyond the fair average of the normal market value of land in the vicinity having a similar character. Otherwise we enter the realm of mere conjecture. We therefore hold that it was error to base the estimates of value of the right of way, yards, and terminals upon the so-called 'railway value' of the property. The company would certainly have no ground of complaint if it were allowed a value for these lands equal to the fair average market value of similar land in the vicinity * * *. The realization of the benefits of property must always depend in large degree on the ability and sagacity of those who employ it, but the appraisement is of an instrument of public service, as property, not of the skill of the users."

In determining the true value of the properties involved in these appeals, the State Board of Tax Appeals has given great weight to the valuations that were attributed to them by the State Tax Commissioner. The Board has also made a very careful study of the sales of property in the vicinity of the properties under appeal, and also of sales elsewhere along the Hudson River water front, Kill Van Kull and upper New York Bay.

The State Board of Tax Appeals finds and determines that the land of the Central Railroad Company of New Jersey, located in Jersey City and known as Class 2 property (items 1 to 23, inclusive) is valued and assessed too high by the

State Tax Commissioner and that it should be reduced to its true value as follows:

| Item No. | Description of Property | Area in Acres | True Value |
|---|---|---|---|
| 1. | Land outside main stem, Terminal Tract at Jersey City, tract extending from southerly line of Lehigh Valley R. R., on the north to the northerly line of land, leased to the North River Coal & Wharf Co., on the south and from a line about 160' west of the west line of Van Vorst St. produced, eastwardly to the exterior line for piers, exclusive of main stem, Block 2145, Plot 49, 47-A, and portion of Plot 51, incl. value of Plot 49-E, under water | 97.063 | $3,882.520 |
| 2. | Land outside main stem, excess Block 2145, Plot 48F (formerly North River Coal & Wharf Co.) | 20.950 | 523,750 |
| 3. | Land outside main stem, extending from Phillips St. to the exterior line for piers, Block 2145, Plot 48-D, including value of Plot 48-G, under water | 71.300 | 1,782.500 |
| 4. | Land outside main stem, extending from Phillips St. Branch to exterior line for piers, Block 2154, Plot 22-G, including value of Plot 22-H, under water | 84.724 | 1,948,652 |
| 5. | Land outside main stem, excess Block 2154, part of Plot 22-J North | 71.503 | 1,430,060 |
| 6. | Land outside main stem, coal pier No. 18 and approach extending from Junction of Phillips St. Branch and Communipaw Branch, L. V. R. R. to pierhead line, being a strip of land, formerly part of 22-J, 800' wide with an average length of about 5477' | 96.049 | 1,920,980 |
| 7. | Land outside main stem, Marine Repair Yard Tract, 475' wide, extending from pierhead line on the east to L. V. R. R. Co. and Phillips St. on the west formerly part of Plot 22-J south | 67.004 | 1,340,080 |
| 8. | Land outside main stem, excess south of main stem, between a line about 160' west of west line of Van Vorst St., produced, and center line of Jersey Ave., exclusive of land leased by the North River Coal & Wharf Co., and tract south thereof, Block 2145, portion of Plot 51 | 28.718 | 574,360 |

| Item No. | Description of Property | Area in Acres | True Value |
|---|---|---|---|
| 9. | Land outside main stem, excess north of main stem, between a line about 160' west of the west line of Van Vorst St., produced to the center line of Jersey Ave. (to the west line grant) Block 1245, Plot 50, | 24.613 | 492,260 |
| 10. | Land outside main stem, excess width in Block 2048, Plot H .................. | 3.120 | 56,160 |
| 11. | Land outside main stem, excess width south of main stem, Locomotive Terminal, Communipaw, Block 2048, Plot S .. ....... | 19.611 | 352,998 |
| 12. | Land outside main stem, excess entrance to Locomotive Terminal, Communipaw, Block 2048, Lots A-1, A-2, 41 and 6-A .... ... | 0.197 | 3,546 |
| 13. | Land outside main stem, excess width in Block 2154, Pot 22-D ..... .... . .... | 5.610 | 84,150 |
| 14. | Land outside main stem, excess width in Block 2048, Plot P . ..... ........... | 3.755 | 56,325 |
| 15. | Land outside main stem, excess width in Block 2048, Plot N ....... ........ | 0.326 | 4,890 |
| 16. | Land outside main stem, excess between C. R. R. of N. J. and the L. V. R. R. of N. J. at Claremont, Block 2020, Plot 4; Block 2033, Plots 8 and 22-D (Graded) . | 15.212 | 182,544 |
| 17. | Land outside main stem, excess in Claremont Yard, Block 2154, Plot 7 and 7-B .. | 6.680 | 80,160 |
| 18. | Land outside main stem, excess between C. R. R. of N. J. and National Docks Railway at Claremont . ....... .. .. | 9.897 | 118,764 |
| 19. | Land outside main stem, excess between Phillips St. Branch and Communipaw Branch, L. V. R. R., Block 2154, Plot 17-A | 1.557 | 18,684 |
| 20. | Land outside main stem, excess between Phillips St. Branch and National Docks Railway, at Claremont, Block 2154, Plot 12-A .. ........ ....... ........ | 2.580 | 30,960 |
| 21. | Land outside main stem, excess north of main stem, at Caven Point Road, between L. V. R. R. Co. and Morris Canal, Block 1491, Plot 1 .... .......... .. ... . | 8.620 | 86,200 |
| 22. | Land outside main stem, excess Van Nostrand Place station grounds ............ | 0.297 | 2,970 |
| 23. | Land outside main stem, excess east and west of main stem, between L. V. R. R. crossing and Chapel Ave. ............ ...... | 1.408 | 14,080 |

$14,987,593

The Bureau of Valuation of the Inter-State Commerce Commission appraised the above property (items 1 to 23, inclusive), as of January 1st, 1937, at $8,435,801. This appraisal was made four years prior to the date of the assessment here being contested. It is highly significant, however, that no evidence has been submitted in this hearing by way of sales or other concrete and objective evidences of true value that would tend to establish a drastic increase of value since the Bureau of Valuation figures were fixed. In view of this appraisal, the Board recommends that the State Tax Commissioner make a careful study of the values of this land for assessment purposes in future years. The Board was handicapped in making a study of the values of this land as of January 1st, 1941, because of the lack of time, which prevented a more exhaustive analysis of the evidence.

The State Board of Tax Appeals finds and determines that the following land, located in the main stem of the Central Railroad Company of New Jersey and known as Class 1 property, is assessed at more than its true value and that it should be reduced from the valuations as fixed by the State Tax Commissioner to its true value which is as follows:

| Item No. | General Location | Area in Acres | True Value |
|---|---|---|---|
| PHILLIPS STREET BRANCH, JERSEY CITY | | | |
| 1. | From beginning of Branch at junction with Main Line to Caven Point Road | 0.815 | $9,780 |
| 2. | To National Docks Ry. | 0.964 | 11.568 |
| 3. | To Communipaw Branch, L. V. R. R. | 1.696 | 20,352 |
| 4. | To end of Branch at Jct. with Main Line | 10.152 | 152,280 |
| | Sub-total, Phillips Street Branch | 13.627 | $193,980 |
| MAIN LINE, JERSEY CITY | | | |
| 1. | From bulkhead line to line 160' west of Van Vorst St. produced | 5.464 | $191,240 |
| 2. | To Jersey Ave. produced | 6.302 | 126,040 |
| 3. | To center line of National Docks Ry. | 2.181 | 39,258 |
| 4. | To center line of Communipaw Ave. | 1.768 | 26,520 |
| 5. | To Caven Point Road | 8.358 | 100,296 |
| 6. | To Linden Ave. | 15.452 | 139,068 |
| 7. | To Gates Ave. | 4.595 | 41,355 |
| 8. | To North Edge of Canal | 4.467 | 40,203 |
| | Sub-total, Main Line, Jersey City | 48.587 | $703,980 |

| Item No. | General Location | Area in Acres | True Value |
|---|---|---|---|
| MAIN LINE, BAYONNE | | | |
| 1. | From Morris Canal to center line of Center Street | 3.624 | $32,616 |
| 2. | To center line of East 32nd Street | 8.898 | 80,082 |
| 3. | To center line of East 30th Street | 1.889 | 17,001 |
| 4. | To East 22nd Street | 5.841 | 52,569 |
| 5. | To East 21st Street | 0.773 | 6,957 |
| 6 | To Linnet Street | 4.614 | 41,526 |
| | | 2.900 | 26,100 |
| 7. | To Avenue "D" (Broadway) | 0.851 | 7,659 |
| 8. | To Avenue "C" | 1.448 | 13,032 |
| 9. | To Hudson County Boulevard | 2.879 | 25,911 |
| 10. | To Avenue "A" | 0.888 | 8,002 |
| 11. | To exterior line for solid filling, Newark Bay | 3.191 | 28,719 |
| | Sub-total Main Line, Bayonne | 37.796 | $340,174 |
| NEWARK AND NEW YORK BRANCH, JERSEY CITY | | | |
| 1. | From Communipaw "Y" to main line | 1.018 | $12,216 |
| 2. | From Ely Line of Communipaw Ave. to Jct. with M. L. | 0.700 | 10,500 |
| 3. | Triangle Jct. M. L. to Ely Line Communipaw Ave. | 0.216 | 2,592 |
| 4. | From main stem of M. L. to point east of Suydam Ave. | 0.920 | 11,040 |
| 5. | To Pacific Ave. | 2.350 | 28,200 |
| 6. | To Halladay St. | 0.546 | 6,552 |
| | North of center line between VanHorn and Woodward Sts. | 0.208 | 2,496 |
| 7. | To Garfield Ave. | 1.981 | 23,772 |
| 9. | To Randolph Ave. | 0.597 | 7,164 |
| 10. | To Clerk St. | 1.600 | 24,000 |
| 11. | To East Side of Jackson Ave. | 2.300 | 34,500 |
| 12. | To Hudson Boulevard | 3.610 | 54,150 |
| 13. | To West Side Ave. | 3.327 | 39,924 |
| 14. | To Mallory Ave. | 2.350 | 18,800 |
| 15. | To Morris Canal | 2.201 | 17,608 |
| 16. | To Hackensack River | 1.753 | 8,765 |
| | Sub-total Newark and New York Branch, Jersey City | 25.677 | $302,279 |

No evidence was given at the hearing to support the values fixed by the State Tax Commissioner on the above land in the main stem of the Central Railroad. The testimony of Mr. R. E. Thompson, Mr. Thomas A. Wyer and Mr. P. W. Limouze places a much lower value on these properties.

The Board is very favorably impressed by the testimony of

Mr. Wyer. He is a graduate civil engineer and his initial experience in the railroad field was along that line. Later he had extensive experience in the conduct of railroad operations and in the expenditure of money on many railroad projects, including the financing thereof. In recent years he has been a practicing consulting engineer on transportation problems, especially railroad reorganization, in the course of which he has made many appraisals of railroad properties from the particular point of view of their revenues, their expenses and other costs, their net income, the investment therein and other elements of value. He qualifies as an expert upon the economic value of all classes of property employed in railroad use. Mr. Wyer testified as to the value of the real estate, both land and structures, located in the main stem of the Central Railroad. His values are based on the revenues received by the railroad and the cost of operation and maintenance. When we bear in mind that the land in the main stem is limited to a market for railroad purposes, his opinion as to the economic value of this land can be considered as the price which some prospective buyers would be willing to pay for this land for railroad use. By economic value we mean the value that should be attributed to the land used as an integral and necessary part of the railroad, determined by the present and prospective revenues to be derived from the operation of the railroad after deducting operating expenses. The values shown in *Exhibit CR-29* for taxation purposes represent Mr. Wyer's opinion of the economic value of the land and structures in railroad use in the main stem of the Central Railroad Company. His land values are evidently much lower than those which the State Board of Tax Appeals has fixed and determined as true value. Here again, the Board recommends to the State Tax Commissioner a careful study of the land in the main stem of the Central Railroad in arriving at the true values thereof for assessments for taxation in subsequent years. The economic value of property used for railroad purposes would be its true value for the purposes of taxation in the opinion of this Board.

Mr. Louis Focht produced a list of overhead bridges which were valued at $111,251 and included in the total assessment. This list was marked in evidence as *CR-77*. It is the contention of the Central Railroad Company that these bridges are not used for railroad purposes and therefore should not be included in the assessment. The evidence shows that they are used only to support streets or public highways crossing the railroad tracks above the roadbed of the railroad. These streets and highways are used only for pedestrian and vehicular traffic.

Section 7 of article 2 of chapter 291 of the laws of 1941 provides that:

"There is hereby levied an annual property tax upon *all property used for railroad purposes* * * . * ."

Section 17 of article 4 of said chapter 291 provides that: "the commissioner shall determine the true value * * * of all *property used for railroad purposes* in this state. He shall, in such determination, ascertain values according to the following classes:

"I. The length and value of the main stem of each railroad, and the length of such main stem in each taxing district;

"II. The value of the other real estate used for railroad purposes in each taxing district in this state, including the roadbed (other than main stem), tracks, buildings, water tanks, riparian rights, docks, wharves and piers, and all other real estate, except lands not used for railroad purposes."

The main stem of a railroad means the roadbed not exceeding 100 feet in width, with its rails and sleepers, and all structures erected thereon and used in connection therewith, not including passenger or freight buildings erected thereon. (Article 1, section 2, chapter 291, *Pamph. L.* 1941.)

It is obvious that a street or public highway crossing the railroad tracks by an overhead bridge which is used only for pedestrian and vehicular traffic is not a part of the roadbed of the railroad or used in connection therewith. And the bridges that support these streets are not property used for railroad purposes. These bridges are part of the public streets or highways.

This Board, therefore, finds and determines that $111,251 should be deducted from the assessed valuation of the "Main Stem," Class No. 1 property of the Central Railroad Company of New Jersey.

The Central Railroad Company complains further that the State Tax Commissioner in making his assessment for 1942 included therein "items aggregating over $1,500,000, representing improvement, relocation, reconstruction, elimination and avoidance of highway grade crossings made pursuant to Title 48 of the Revised Statutes * * * contrary to chapter 54:29A-10 of the Revised Statutes of New Jersey."

Evidence was adduced with regard to the following grade crossing eliminations, all of which were ordered by the Public Utility Commission of New Jersey:

Somerville elimination completed in 1927;

Perth Amboy elimination completed in 1928;

Cranford elimination completed in 1931;

Elizabethport elimination completed in 1940.

The statute under which appellant claims exemption, *R. S.* 54:29A-10, reads as follows:

"The value of the main stem of each railroad and the other real estate thereof used for railroad purposes shall be ascertained without including any part of the cost of improvement, relocation, reconstruction, elimination or avoidance of highway grade crossings, including State highways, made pursuant to Title 48 of the Revised Statutes, or pursuant to the provisions of an agreement for any of such purposes with a municipality made after April twenty-seventh, one thousand nine hundred and thirty-one, but such exemptions shall apply only to main lines and branches existing on April twenty-seventh, one thousand nine hundred and thirty-one." Laws 1941, chapter 291, page 776, section 10.

As the Revised Statutes were adopted in 1937, it would seem that the Somerville elimination, the Perth Amboy elimination and the Cranford elimination were not "made pursuant to Title 48 of the Revised Statutes" because they were all made before Title 48 of Revised Statutes came into existence. Nevertheless, it appears from the testimony of Mr. Focht that the State Tax Commissioner in making up

the 1942 assessment did exempt the cost of all four grade crossing eliminations named above, in so far as such cost represented the grade crossing as such.

At the request of the Board, the State Tax Commissioner had prepared and placed in evidence an analysis, with accompanying maps and photographs, of each of such grade crossing eliminations. These analyses detailed the various kinds of property assessed as "main stem" and as "second class," and in separate columns set out, the value before grade crossing elimination, the 1942 assessment, the State Tax Department value new after the elimination, and the cost reported by the railroad company. From such exhibits and the testimony of Mr. Focht, it appeared that in each grade crossing elimination a portion of the cost to the railroad represented excess cost for betterment that was not essential to the grade crossing elimination, but desirable from the railroad point of view. Some of these items could be divorced from the essentials, others could not. To mention a few, heavier rails were used, larger and more modern interlocking plants were erected and equipped, larger and more modern passenger stations were built, station grounds were enlarged and improved.

The State Tax Commissioner in making his assessment separated the essential cost of the grade crossing elimination from such excess cost for betterment and did not include in his value for assessment such essential cost.

Appellant contends, however, that all the costs should be exempt, whether they are essential to the project or for excess betterment of the railroad. We do not agree. The statute exempts not the cost of the whole improvement but "the cost of improvement * * * of highway grade crossings," not the cost of the whole reconstruction but "the cost of * * * reconstruction * * * of highway grade crossings." We believe the method followed by the State Tax Commissioner to be in accordance with the statute. In the opinion of the Board, the legislature did not intend to allow a railroad to make a general improvement of its right of way or second class property in anticipation of future needs or for the purpose of reducing its overhead, and nevertheless escape

taxation on the added value because such general improvement was made in connection with a necessary grade crossing elimination.

There is one correction in the assessment, however, which should be made. In the analysis of the Elizabethport grade crossing elimination, *Exhibit S*-8, the State Tax Commissioner concedes that the item of $248,666 for bridges and culverts on the Elizabethport and Perth Amboy branch is improper and should be eliminated. This will be done.

The appeal of the Central Railroad of New Jersey from the assessment of the franchise excise tax against it is based primarily upon a construction of the word "system" and the phrase "net railway operating income" different from that arrived at by the State Tax Commissioner.

The Central Railroad of New Jersey operates under lease a division of its road in the State of Pennsylvania (hereinafter referred to as the L. & S. Division), which division it claims should not be included in its system, as system is defined under section 2 of the Railroad Tax Law of 1941. From the exhibits put in evidence by the appellant, it appears that this is the only division of the Central Railroad of New Jersey that shows any net railway operating income for the year 1941. As the franchise tax is based on the net railroad operating income for the preceding year, appellant argues that the franchise tax assessable against it for the year 1942 cannot exceed the minimum provided by statute, to wit: $4,000.

The statute *R. S.* 54:29A-2; *N. J. S. A.* 54:29A-2 defines system as follows:

" 'System' means any independently operating railroad which operates its facilities and those of one or more other railroads as a single utility for furnishing transportation service. A system shall include all companies the property of which is so operated either by virtue of control through direct or indirect ownership of a majority or more of capital stock, or under lease, trackage rights or under any other form of contract, and for which separate operating accounts are not maintained."

If the above definition had ended with the first sentence, the L. & S. Division of appellant would be included in appellant's system. This is admitted by appellant's witnesses. However, it is argued by appellant that the next sentence limits this meaning. We do not think so. In the opinion of this Board, the legislature attempted to enlarge its definitions as contained in the first sentence. We further think that the phrase "and for which separate operating accounts are not maintained" does not refer to the internal bookkeeping methods of the controlling railroad. In the opinion of the Board, the L. & S. Division of appellant was properly included in appellant's system in determining the franchise tax.

Appellants further contend that even if this be so, the franchise assessment is erroneous because it is not computed in the manner set forth in the statute. Specifically, appellant alleges that the rental paid by it for the use and occupation of its L. & S. Division was not included in its "costs of operation" by the State Tax Commissioner in determining appellant's net railway operating income. This seems to be the fact, and again we turn to the statute to test the accuracy of the Commissioner's assessment.

The statute, *R. S.* 54:29A-14; *N. J. S. A.* 54:29A-14, as amended, provides as follows:

"For the purpose of this section, net railway operating income shall be computed as total railway operating revenues from all sources, including any revenue whatever derived directly or indirectly from property which is used for railroad purposes, less costs of railroad maintenance, operation and depreciation, railway tax accruals, uncollectible railway revenues, rentals (both debits and credits) for equipment leased for less than one year or interchanged, and joint facility rents (both debits and credits), and the amount remaining shall constitute the net railway operating income hereinafter mentioned. Deductions from operating revenues for depreciation, additions and betterments, and compensation for personal services shall be subject to regulation by the commissioner, as to reasonableness of amount and appropriateness of accounting distribution. Depreciation charges

shall in no instance, however, exceed the amount claimed by the railroad for depreciation in its report or reports to the Interstate Commerce Commission and fixed, or if none was claimed then as fixed, by the Interstate Commerce Commission in determining the net railway operating income of the railroad for the year under consideration."

Nowhere in such statute is provision made for deduction of rentals for a leased road unless it be included in "costs of railroad maintenance, operation and depreciation."

On first impression, it would seem that rentals for a leased road would surely be included in costs of operation; but so. would "railway tax accruals" and "rentals for equipment" and "joint facility rents," all of which are mentioned in the statute as deductions to be taken in addition to costs of operation. It seems clear therefore that costs of operation must have a special significance when applied to railroads, and naturally we turn to the income and expense statements of appellant that have been put in evidence. These statements are many and varied. One shows the results obtained from each subdivision and then combines them all. Another shows the results obtained from each of its divisions. Another shows the results obtained from operations in the State of New Jersey and from operations in the State of Pennnsylvania. Still another shows the results obtained from the system as a whole, and is a copy of the statement submitted to the State Tax Commissioner under the statute. The report of appellant to the Interstate Commerce Commission of the United States for the year 1941 was also introduced in evidence.

It is noted that although each of such statements and the report to the Interstate Commerce Commission contains a heading "Operating Expenses" and lists several items thereunder, the rentals paid for leasing the L. & S. Division do not appear under said heading. It would appear, therefore, that such rentals are not considered "operating expenses" by the railroad, and this would seem to be borne out by the fact that such rentals only appear at the end of such statements with a note that they should be deducted from the net result.

"Operating expenses" and "costs of operation" would seem to be interchangeable terms, and as rentals for leased roads do not come under "operating expenses" in the railroad exhibits, it would seem that they do not come under "costs of operation" as that term is used in the statute. This being so, they are not deductible in ascertaining net railway operating income under the statute.

Mr. Autenrieth, counsel for the Central Railroad Company; Mr. Casale, counsel for the City of Newark, and Mr. Walsh, representing the Attorney-General for the State Tax Commissioner, have agreed that the assessed valuation of the land included in the main stem, Class I property, of the Central Railroad Company located in the City of Newark, New Jersey, beginning at East Ferry Street and running to the end of the line, and three parcels of land in second class railroad property should be reduced $98,000. Mr. Fryer stated the reduction agreed upon in the record of the hearing as follows:

"After consideration of the assessments, and the values testified to by the City's expert and the railroad company's expert, it would seem that the reduction agreed on is $98,000, which would be a reduction of land values on the main stem with the exception of the five parcels that were eliminated by consent, the first five parcels in the main stem, and three parcels on second class, namely, the freight yard at Ward and Mulberry Streets, the yard at Broad Street and the freight yard at Lafayette Street."

This Board, therefore, finds and determines that $98,000 should be deducted from the assessed valuation of the main stem, Class I property, of the Central Railroad Company of New Jersey located in the City of Newark, beginning at East Ferry Street and running to the end of the line and three parcels of land in Class II property; namely, the freight yard at Ward and Mulberry Streets, the yard at Broad Street, and the freight yard at Lafayette Street.

In all other respects, except as above noted, this Board confirms the assessments and valuations as levied by the State Tax Commissioner.